**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

LIGURIA FOODS, INC.,

              Plaintiff,

vs.

GRIFFITH LABORATORIES, INC.,

              Defendant.

No. C14-3041-MWB

**MEMORANDUM OPINION AND ORDER REGARDING DEFENEANT'S MOTION FOR SUMMARY JUDGMENT**

_____

**TABLE OF CONTENTS**

*I.   INTRODUCTION AND BACKGROUND ............................................................ 2*
   *A.   Factual Background ........................................................................ 2*
   *B.   Procedural Background ................................................................... 5*
*II.  LEGAL ANALSYSIS ..................................................................................... 6*
   *A.   Summary Judgment Standards ......................................................... 6*
   *B.   Implied Warranty Claim ................................................................... 7*
   *C.   Implied Warranty For a Particular Purpose ....................................... 12*
*III. CONCLUSION ........................................................................................... 14*

The fighting issue in this summary judgment motion is whether the perishability of plaintiff's pepperoni product was shortened by a spice mixture supplied by the defendant. This case is before me on the defendant's Motion for Summary Judgment.

## I. INTRODUCTION AND BACKGROUND

### A. Factual Background

I set out only those facts, disputed and undisputed, sufficient to put in context the parties' arguments concerning the defendant's Motion for Summary Judgment and resistance to it. At least for the purposes of summary judgment, the facts recited, here, are either undisputed or facts construed in the light most favorable to the nonmoving party, the plaintiff.[1] I will discuss additional factual allegations, and the extent to which they are or are not disputed or material, if necessary, in my legal analysis.

Plaintiff Liguria Foods, Inc. ("Liguria") is a pepperoni and dried sausage manufacturer with its principal place of business in Humboldt, Iowa. Liguria's most popular product is a finished pepperoni product called "Liguria Pepperoni." Liguria creates its pepperoni product by combining 2,450 pounds of pork and beef trimmings with a curing agent and a customized spice blend. Liguria mixes the product in a large industrial mixer

---

[1] Defendant Griffith Laboratories, Inc.'s ("Griffith") statement of material facts failed to comply with Local Rule 56(a). Under Local Rule 56(a),

> Each individual statement of material fact must be concise, numbered separately, and supported by references to those specific pages, paragraphs, or parts of the pleadings, depositions, answers to interrogatories, admissions, exhibits, and affidavits that support the statement, with citations to the appendix.

LOCAL RULE 56(a). Instead of complying with Local Rule 56(a)'s requirements, Griffith cites to the entirety of sub-appendixes within its appendix. As a result, it is exceedingly difficult to verify Griffith's factual assertions. Because Griffith violated Local Rule 56(a), I have only considered those facts that are uncontested by plaintiff Liguria Foods, Inc. *See Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1001 (7th Cir. 2004) (where party fails to cite the record, "we will not root through the hundreds of documents and thousands of pages that make up the record here to make his case for him."); *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in" the record).

2

and then processes it through a tube and into castings to be cut, hung and dried for several weeks. After curing is completed, Liguria slices and packages the pepperoni into 25 pound boxes for shipment to customers, covered with plastic wrapping.

Defendant Griffith Laboratories, Inc. ("Griffith") is an Illinois based manufacturer of food seasonings and spice blends. Its principal place of business is in Alsip, Illinois. Beginning in approximately 1994, Griffith sold mixes of custom spices to Liguria or its predecessor company, Humboldt Sausage. In 1999, Liguria worked with Griffith to develop a special spice blend to be used in Liguria's most popular pepperoni product.[2] Griffith sold Pepp Spice in bags weighing approximately 33 pounds. Griffith produced approximately 150 bags of Pepp Spice in a batch. Griffith required a minimum order of 300 bags of Pepp Spice in an order. Over the following 14 years, Liguria ordered millions of pounds of Pepp Spice from Griffith.

In April 2011, Liguria began buying a special seasoning formula from Griffith for its exclusive use in Liguria Pepperoni. Griffith called this formula "Optimized Pepperoni Seasoning" and assigned it the formula code 017-2112. At the request of Liguria, Griffith added antioxidants butylated hydroxyanisole ("BHA") and butylated hydroxytoluene ("BHT") to the Optimized Pepperoni Seasoning.[3] Liguria relied upon Griffith to ensure that the levels of BHA and BHT complied with the United States Department of Agriculture's ("USDA") requirements and that they were uniformly distributed in the

---

[2] Griffith states that this spice was known as "Pepp Spice."

[3] Antioxidants are ingredients that are added to prevent oxidation in meat products from happening or to, more appropriately, delay it from happening. Antioxidants delay the onset of fat oxidation by themselves reacting with, or intercepting, the free radicals and "quenching" the chain reaction. Both synthetic and natural antioxidants are available to delay oxidation in meat products. There are many synthetic antioxidants on the market. The most common synthetic antioxidants are BHA and BHT. Other common synthetic antioxidants used in the meat industry include tertiary butylhydroquinone ("TBHQ") and propyl gallate ("PG").

3

Optimized Pepperoni Seasoning.[4] Griffith was responsible for the development and formulation of the Optimized Pepperoni Seasoning.

Griffith's typical batch of Optimized Pepperoni Seasoning was approximately 5,000 pounds. Prior to adding BHA and BHT to the mix, Griffith added the salt, sugars, and four liquid oleoresins, capsaicin, paprika, anise, and fennel, to the mixer. These ingredients weighed 2,938 pounds together. Griffith used a crystalline or powder form of BHA and BHT. Seven pounds of BHA and BHT were added to a batch of Optimized Pepperoni Seasoning. Griffith did not pre-blend the BHA and BHT with other ingredients before adding it to the 2,938 pounds of salt, sugar, and the four liquid oleoresins already in the mixer.

In late 2012 and early 2013, Liguria received complaints from customers that the pepperoni containing Optimized Pepperoni Seasoning was prematurely turning green and grey. This was occurring within 140 to 160 days after production. Liguria Pepperoni was supposed to have a shelf life of 270 days from slicing.[5] Liguria lost several of its long-standing customers around this period.

Liguria contacted Griffith for its assistance in identifying the source of the premature spoliation of its pepperoni products. On January 6, 2013, Jim Whitham, Liguria's Director of Quality Assurance, wrote to Kent Holt, Griffith's manager of Liguria's account, regarding the discoloration and oxidation problems occurring in Liguria

---

[4] The USDA regulates the allowable limits of BHA and BHT used in dry sausage. *See* 9 C.F.R. § 318.7. This regulation provides that the maximum allowable amount of BHA in a dry sausage product is 0.003%, or 30 parts per million, of the total weight of the product. The regulation further provides that the maximum allowable amount of BHT in a dry sausage product is also 0.003%, or 30 parts per million, of the total weight of the product. The regulation further states that the maximum allowable amount of both BHA and BHT, when used in combination in a dry sausage product, is .006%, or 60 parts per million, of the total weight of the product.

[5] The maximum amount of optimal time from the production of a pepperoni product to its use is referred to as the "shelf life" of the product.

pepperoni. In response, Holt sought additional information about Liguria's storage of the spice mix and requested product sample testing in Griffith's facilities. On January 22, 2013, Kathy Adams, conducting testing on the pepperoni, wrote Griffith asking about the age of the pepperoni sample sent by Liguria and verifying that Liguria Pepperoni's shelf life was 9 months.

On February 13, 2013, Whitham wrote to Stan Seavey, a private consultant, that Liguria was "dealing with a different raw material base than we were 2-3 years ago." Whitham noted his discussions with Liguria about a shortened shelf life in which he suggested "reducing our shelf life down to 180 days" but was waiting on approval to do so. Whitham also noted recommending to Liguria that it use beef frozen two months or less. Whitham further noted that, "I see our system being suspect in being susceptible to some variations no matter what we put in place."

Liguria concluded that the Optimized Pepperoni Seasoning contributed to the premature spoliation of its pepperoni products. Liguria reached this conclusion because Liguria used the same type and quality of meat in multiple products, but only the pepperoni products containing the Optimized Pepperoni Seasoning experienced premature spoliation.

### B.  *Procedural Background*

On July 3, 2014, Liguria filed a Complaint alleging claims for breach of implied warranty of fitness for a purpose and breach of implied warranty of merchantability. Griffith filed an Answer which denied the substance of Liguria's claims. Griffith subsequently filed a Motion for Summary Judgment, contending that, following discovery, it was evident that Liguria's claims fail as a matter of law. Specifically, Griffith contends Liguria's claim for breach of implied warranty of merchantability fails as a matter of law because Liguria cannot establish that Griffith's Optimized Pepperoni Seasoning product was defective. Griffith also contends that Liguria's claim for breach of implied warranty

of fitness for a purpose fails because Liguria cannot establish that Griffith's Optimized Pepperoni Seasoning was used for a purpose. Liguria timely resisted Griffith's Motion for Summary Judgment and Griffith, in turn, filed a timely reply. Liguria subsequently requested and was granted permission to file a sur-reply brief, which it filed on January 12, 2017.

## II. LEGAL ANALSYSIS
### A. Summary Judgment Standards

Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact *and* that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thus, "[t]he movant 'bears the initial responsibility of informing the district court of the basis for its motion,' and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Celotex*, 477 U.S. at 323). In response, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

When the parties have met their burden, the district judge's task is as follows:

> "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, ——

U.S. ——, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) quoting *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (internal quotations omitted). "Credibility determinations, the weigh-ing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). . . . . "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Ricci*, 129 S. Ct. at 2677, quoting *Matsushita*, 475 U.S. at 587, 106 S. Ct. 1348.

*Torgerson*, 643 F.3d at 1042-43.

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ryan v. Capital Contractors, Inc.*, 679 F.3d 772, 776 (8th Cir. 2012). However, summary judgment is particularly appropriate when only questions of law are involved, rather than factual issues that may or may not be subject to genuine dispute. *See, e.g., Cremona v. R.S. Bacon Veneer Co.*, 433 F.3d 617, 620 (8th Cir. 2006).

With these standards in mind, I will address Griffith's Motion for Summary Judgment.

### B. *Implied Warranty Claim*

Iowa law provides for an implied warranty of merchantability.[6] *See* IOWA CODE § 554.2314(1) ("Unless excluded or modified . . ., a warranty that the goods shall be

---

[6]Iowa common-law recognizes some common-law implied warranty claims. *See Chicago Cent. & Pac. R.R. Co. v. Union Pac. R.R. Co.*, 558 N.W.2d 711, 715 (1997) (common-law implied warranty of fitness for a particular purpose). However, I have not found any Iowa cases recognizing a common-law implied warranty of merchantability. A claim of breach of implied warranty of merchantability, at least as to "goods," is statutory.

7

merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."). The Iowa Supreme Court has "observed that a warranty of merchantability 'is based on a purchaser's reasonable expectation that goods . . . will be free of significant defects and will perform in the way goods of that kind should perform.'" *Wright*, 652 N.W.2d at 180–81 (quoting *Van Wyk v. Norden Labs., Inc.*, 345 N.W.2d 81, 84 (Iowa 1984), with emphasis added in *Wright* ). As opposed to the implied warranty for a particular purpose, "the implied warranty of merchantability involves the fitness of goods for their ordinary purpose." *Renze Hybrids, Inc. v. Shell Oil Co.,* 418 N.W.2d 634, 638 (Iowa 1988); *Van Wy*k, 345 N.W.2d at 87 (in contrast to a claim of breach of warranty for a particular purpose, a claim of breach of "the warranty of merchantability does not require evidence of a particular purpose or of the seller's knowledge of a particular purpose of the buyer, or that the seller had reason to know the buyer was relying on the seller's skill and judgment, or that the buyer in fact relied upon the seller's skill and judgment"). As the Iowa Supreme Court explained, in *Scott v. Dutton–Lainson Co.*, 774 N.W.2d 501 (Iowa 2009),

> *Wright* held . . . that a claim for breach of implied warranty under Iowa Code section 554.2314(2)(c) "requires proof of a product defect as defined in Products Restatement section 2." *Wright*, 652 N.W.2d at 181–82. Therefore, a breach of warranty claim will require proof of the standard for either a manufacturing defect, a design defect, or a failure to warn.

*Scott*, 774 N.W.2d at 505 n. 2. "Goods to be merchantable must be at least such as . . . are fit for the ordinary purposes for which such goods are used[.]" IOWA CODE § 554.2314(2)(c).

---

*See, e.g. Wells Dairy, Inc. v. American Indus. Refrigeration, Inc*., 762 N.W.2d 463, 474 (Iowa 2009) (implied warranties of fitness for ordinary use or merchantability and fitness for a particular purpose "arise by operation of law in connection with the sale of goods," citing Iowa Code §§ 554.2314 (implied warranty of merchantability—usage of trade) and 554.2315 (implied warranty of fitness for a particular purpose)).

8

In its Complaint, Liguria maintains that Griffith designed and manufactured the Optimized Pepperoni Seasoning specifically for Liguria and knew Liguria's intended use and intended purpose for the Optimized Pepperoni Seasoning. Liguria asserts that Griffith owed it an implied warranty of merchantability and Griffith breached that warranty when Griffith's Optimized Pepperoni Seasoning failed to sufficiently delay the oxidation of Liguria's Pepperoni.

Griffith moves for summary judgment on Liguria's implied warranty of merchantability claim, arguing that Liguria cannot establish that the Optimized Pepperoni Seasoning was defective. I conclude that Liguria has generated a genuine issue of material fact on this issue. More particularly, genuine issues of material fact exist on the question of whether Griffith properly mixed the Optimized Pepperoni Seasoning.[7]

Griffith's typical batch of Optimized Pepperoni Seasoning was approximately 5,000 pounds. Griffith used two mixers in its production of the Optimized Pepperoni Seasoning. Prior to adding BHA and BHT to the mix, Griffith added salt, sugars, capsaicin, paprika, anise, and fennel. These ingredients weighed 2,938 pounds together. Griffith used a crystalline or powder form of BHA and BHT. The amount of BHA and BHT added to the 5,000 pound batch of Optimized Pepperoni Seasoning was only 7 pounds. Griffith did not pre-blend the BHA and BHT with other ingredients before adding it to the 2,938 pounds of salt, sugar, and the four liquid oleoresins already in the mixer. Liguria's expert, Dr. David S. Dickey, opines that:

> The two critical antioxidants (BHA and BHT) in Optimized Pepperoni Seasoning are minor ingredients, less than 0.5% of the quantity of material in the mixer at the time of addition. Minor ingredients (<0.5%) need to be premixed, at least in a

---

[7]Griffith's own expert, Dr. John Carson, stated in his deposition that he had not ruled out inadequate mixing of the Optimized Pepperoni Seasoning as the cause of the oxidation issues Liguria experienced. Dr. Carson further stated that "[a]s possible causes, certainly it's possible that the Griffith seasoning did not have the correct amount of antioxidant." Plaintiff's Supp. App. at 5; Carson Dep. at 13.

9

> smaller quantity of a major ingredient to assure uniform distribution in the final product. Griffith's failure to premix minor ingredients makes uniform distribution of those ingredients in the final batch nearly impossible.

Plaintiff's App. at 744; Dickey Aff. at ¶ 9(a).

Dr. Dickey also opines that Griffith's adding of the BHA and BHT after the four liquid oleoresins was another error Griffith made in the production of the Optimized Pepperoni Seasoning and caused the premature spoliation of Liguria's pepperoni. Dr. Dickey explained:

> The antioxidants, BHA and BHT, were added to the Optimized Pepperoni Seasoning after the addition of flavoring oils. Had Griffith added the antioxidants to either the dry salt of the dry sugar, uniform blending of free-flowing solids would have made blending easier and more uniform. The oils changed the otherwise free-flowing salt and sugar into a moderately cohesive mass of oily granular powder. Moderately cohesive materials are much more difficult to blend uniformly than free flowing materials. The cohesive nature of the materials may even form lumps with high or low concentrations of antioxidants that fail to disperse in the batch. Differences in the order of addition for ingredients in Griffith formulas for pepperoni seasoning makes a significant difference in the uniformity of minor ingredients.

Plaintiff's App. at 744; Dickey Aff. at ¶ 9(b).

Liguria further argues that not only were the ingredients of the Optimized Pepperoni Seasoning not mixed in the proper order, but that Griffith chose the wrong form of BHA and BHT. Liguria contends that Griffith should have purchased these antioxidants in a liquid form or dissolved the BHA and BHT into vegetable oil before adding them to the mix. Liguria's expert witness believes that such a process would have "improv[ed] the uniform distribution of the antioxidants in the final product." Plaintiff's App. at 745; Dickey Aff. at ¶ 9(c). "Determining the credibility of a witness is the jury's province, whether the witness is lay or expert." *DiCario v. Keller Ladders, Inc.,* 211 F.3d 465, 469

10

(8th Cir. 2000) (citing 3 WEINSTEIN'S FEDERAL EVIDENCE § 601.03[2][a] at 601–13 (Joseph M. McLaughlin ed., 2d ed. 2000)); *Stevenson v. Union Pac. R.R. Co.*, 354 F.3d 739, 745 (8th Cir. 2004) (same).

Griffith counters that many factors, other than the amount of antioxidants in the spice blend, affect a product's shelf life. Other than providing its Optimized Pepperoni Seasoning to Liguria, Griffith had no control of these other factors. Specifically, Griffith points to a general decline in the quality of the pork supply that has resulted from the use of Dried Distillers Grain, an ethanol production by-product, as pig feed. Griffith further points out that Liguria did not experience oxidation problems with its pepperoni products until 2012, but Griffith supplied Liguria with its spice blends for the previous 14 years without incident and that there is no evidence in the record that it changed its mixing procedures in any way during those 14 years. Griffith's argument, however, is flawed. First, it completely side steps Dr. Dickey's opinion that there were flaws in Griffith's mixing procedure for its Optimized Pepperoni Seasoning.[8] Second, Griffith's argument ignores the fact that its Optimized Pepperoni Seasoning was a revised seasoning formulation and that Liguria did not start buying it until April 2011. Liguria experienced oxidation problems with its pepperoni products the next year. Finally, this argument fails to take into account that Liguria used the same type and quality of meat in multiple products, but only the pepperoni products containing the Optimized Pepperoni Seasoning experienced the premature spoliation.

I conclude that, viewing the record in the light most favorable to Liguria, Dr. Dickey and Liguria's other expert witnesses' opinions are sufficient to generate genuine issues of material fact on the question of whether there was a defect in the production of Optimized Pepperoni Seasoning. *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1042–43 (8th

---

[8] As I noted above, Griffith's own expert, Dr. Carson, had not ruled out inadequate mixing of the Optimized Pepperoni Seasoning as the cause of the oxidation issues Liguria experienced.

Cir. 2011) (explaining that, on a motion for summary judgment, the non-movant must come forward with specific facts showing that there is a genuine issue for trial, and the court must consider the evidence in the light most favorable to the non-movant); *see also Celotex Corp.*, 477 U.S. at 323–24.

Consequently, I deny Griffith's Motion for summary Judgment on this claim.

### C.     *Implied Warranty For a Particular Purpose*

Iowa law also recognizes both statutory and common-law implied warranties of fitness for a particular purpose. *See Chicago Cent. & Pac. R.R. Co. v. Union Pac. R.R. Co.*, 558 N.W.2d 711, 715 (Iowa 1997); IOWA CODE § 554.2315. Section 554.2315 provides that:

> Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under section 554.2316 an implied warranty that the goods shall be fit for such purpose.

IOWA CODE § 554.2315. Recovery under § 554.2315 requires "proof of the following elements: (1) the seller had reason to know of the buyer's particular purpose; (2) the seller had reason to know the buyer was relying on the seller's skill or judgment to furnish suitable goods; and (3) the buyer in fact relied on the seller's skill or judgment to furnish suitable goods." *SmithCo Mfg., Inc. v. Haldex Brake Prods. Corp.*, 708 F. Supp.2d 816, 820 (N.D. Iowa 2010); *see Renze Hybrids, Inc.*, 418 N.W.2d at 637; *Van Wyk*, 345 N.W.2d at 84.

> A "particular purpose" differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are

those envisaged in the concept of merchantability and go to
uses which are customarily made of the goods in question.

IOWA CODE § 554.2315 cmt. 2. "The warranty of fitness under section 554.2315 is said to turn on the 'bargain-related' facts as to what the seller had reason to know about the buyer's purpose for the goods and about his reliance on the seller's skill or judgment in selecting them." *Van Wyk*, 345 N.W.2d at 84.

Generally, the particular use may not be the use normally expected to be made of the goods. *See id*. at 85. "For example, shoes are generally used for the purpose of walking upon ordinary ground, but a seller may know that a particular pair was selected to be used for climbing mountains." IOWA CODE § 554.2315 cmt. 2. However, "in some cases a buyer's particular purpose will be the same as the ordinary purpose for which a product is furnished." *Van Wyk*, 345 N.W.2d at 85.

Griffith maintains that it is entitled to summary judgment on this claim because Liguria "cannot show any facts to support its claims that Griffith intended to design a spice mixture with a 270-day shelf life and departed from this design, nor that its original design contained an unreasonable risk to Liguria." Griffith's Br. at 16. From my review of the summary judgment record, I conclude that Liguria has generated a genuine issue of material fact on the question of whether Griffith had reason to know that it was to make a seasoning containing BHA and BHT that was to support a 270-day shelf life for Liguria's pepperoni. In July 2009, in an email, Whitham wrote Adams concerning Liguria's problems with excessive oil and grease in its pepperoni. Whitham wrote, in part, that Liguria Pepperoni had a shelf life of 270 days from slicing. On January 22, 2013, Kathy Adams, Griffith's Quality Systems Compliance Manager, conducting testing on Liguria's Pepperoni, wrote Griffith asking about the age of the pepperoni sample sent by Liguria and verifying that Liguria pepperoni's shelf life was 270-days.

In addition, there is evidence in the summary judgment record that a 270-day shelf life for Liguria's pepperoni products should have come as no surprise to Griffith since, as

13

far back as 1994, when dealing with Liguria's predecessor company, Humboldt Sausage, Griffith sales representative, Kent Holt, was told by Humboldt Sausage's purchasing manager, Donald Conner, that the seasoning Griffith was formulating was to be used in a pepperoni product that would have to last nine months. Since pepperoni production began at the facility in Humboldt in 1974, the shelf life of the pepperoni products has always been 270-days from production.

Construing the facts in the light most favorable to Liguria, Liguria has generated a genuine issue of material fact on the question of whether Griffith had reason to know that Liguria's pepperoni products had a 270-day shelf life. Furthermore, I conclude that Liguria presented sufficient evidence that it relied on Griffith's expertise to produce a suitable seasoning mixture, and Griffith had reason to know that Liguria would so rely. Accordingly, Liguria has presented sufficient evidence to support its claim for breach of implied warranty of fitness for a purpose, and I deny that portion of Griffith's Motion for Summary Judgment on this claim.

### III.   CONCLUSION

For the reasons discussed above, Griffith's Motion for Summary Judgment is denied as to all claims.

**IT IS SO ORDERED**.

**DATED** this 23rd day of January, 2017.

_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA